# United States Court of Appeals
## For the First Circuit

No. 02-2114

DJ MANUFACTURING CORPORATION,
Plaintiff, Appellant,

v.

TEX-SHIELD, INC.,
Defendant, Appellee,

XYZ INSURANCE CO., CREATIVE APPAREL,
BLUCHER USA, BLUCHER GMBH.,
Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Torruella, Selya and Lipez,
Circuit Judges.

Marc Lamer, with whom Kostos & Lamer, PC, Eugene F. Hestres
and Bird, Bird and Hestres were on brief, for appellant.
Timothy K. Beeken, with whom Debevoise & Plimpton, Daniel M.
Abuhoff, Correa, Collazo, Herrero, Jiménez & Fortuño and Pedro
Jiménez were on brief, for appellee.

**ON PETITION FOR REHEARING**

October 20, 2003

**TORRUELLA**, **Circuit Judge**.    Plaintiff-appellant DJ Manufacturing ("DJM") alleges that Tex-Shield, Inc. ("Tex-Shield") and Creative Apparel Associates ("Creative Apparel") violated, inter alia, a Puerto Rican antitrust statute, 10 P.R. Laws Ann. § 264 (2002), by conspiring to destroy competition in the market for chemical protective clothing in Puerto Rico.[1]  The district court dismissed the complaint on a motion to dismiss.  After careful review, we affirm.

## I.  Facts

Because this is an appeal from a dismissal under Fed. R. Civ. P. 12(b)(6), "[w]e glean the facts from the amended complaint, stripped of any rhetorical gloss." Young v. Lepone, 305 F.3d 1, 4 (1st Cir. 2002).

DJM manufactures sewn clothing and equipage for the United States military.  It is a "small disadvantaged business" under 48 C.F.R. § 19.001 (2003) and a certified participant in the Small Business Administration's program for contracts set aside to small disadvantaged businesses under Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a) (2000).

---

[1]  The plaintiffs also alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Sections 2(a), (e), and (f) of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), (e), (f), the Puerto Rican statute dealing with price discrimination, 10 L.P.R.A. § 263, and the Puerto Rican statute dealing with transactions in restraint of trade, 10 L.P.R.A. § 258.  The district court's decision is unchallenged with respect to these other claims.

Defendant Tex-Shield manufactures, and its parent Blucher GmbH holds a patent for, technology used to produce a chemical protective material known as "Saratoga Filter Cloth" (the "Cloth"). The Cloth is a protective shield against biological and chemical agents sewn into garments purchased by the United States military and used for protection against attack by chemical warfare.

In July 1993, the United States Air Force ("USAF") requested bids for the production of 40,000 chemical defense coveralls. The bidding was limited to businesses participating in the SBA's § 8(a) program, such as DJM. The USAF specified that the coveralls must be made using the Cloth and identified Tex-Shield as the sole source. DJM won the contract.

DJM then subcontracted with Tex-Shield to buy the Cloth for a price of $49.27 per yard. Subsequently, DJM and Tex-Shield made a "technical services" contract, whereby, for a fee of $35,000 per month for twelve months, Tex-Shield agreed to provide DJM with certain technical services.

On June 24, 1994, the Defense Personnel Support Center ("DPSC") solicited proposals for the production of at least 100,000 chemical and biological suits, with an option for more. As with the USAF solicitation, the DPSC solicitation was limited to SBA's § 8(a) program participants. Also, the solicitation required the suits be made with the Cloth; again, Tex-Shield was identified as the Cloth's sole approved source.

In preparing its bid for DPSC, DJM inquired as to the cost of procuring the Cloth. Tex-Shield quoted DJM a price of $38.71 per yard for the first 100,000 suits, and $41.07 per yard for any additional yardage. Tex-Shield quoted DJM a price of $148.95 for the first 100,000 suits in pre-cut "kits" and $154.43 per kit for any extra kits. Based on these quotes, DJM offered DPSC a price of $186.62 per unit for the first 100,000 suits and $183.50 for any more suits. Creative Apparel bid $179.55 for the first 100,000 suits and $186.02 for any extra. Creative won the contract.

DJM filed a complaint against Tex-Shield, Blucher USA, Blucher GmbH, and Creative Apparel,[2] alleging several federal and state antitrust violations. The complaint included allegations that Tex-Shield violated § 264 of the Puerto Rico Anti-Monopoly Act by selling goods in Puerto Rico at prices different from the price at which the articles were sold elsewhere.

The district court dismissed all of the claims, including the § 264 count, for failure to state a cause of action. See Fed. R. Civ. P. 12(b)(6). In dismissing the § 264 count, the district court read the section only as an anti-dumping statute, forbidding the sale of goods at lower prices in Puerto Rico.

---

[2] Tex-Shield is wholly owned by Blucher USA, which in turn is wholly owned by Blucher GmbH. Creative Apparel is, like DJM, a clothing and equipage manufacturer. Tex-Shield, the Cloth's sole supplier, also makes finished chemical and biological protective clothing.

DJM appeals only the lower court's dismissal of the § 264 count.

## II. **Standard of Review**

We review the district court's resolution of Tex-Shield's motion to dismiss de novo. Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16 (1st Cir. 1998). When a litigant is facing a summary dismissal, we first accept the complaint's well-pleaded factual allegations as true, drawing all reasonable inferences in the plaintiff's favor, and then determine whether this reading of the complaint justifies recovery on any cognizable theory. Martin v. Applied Cellular Tech., Inc., 284 F.3d 1, 6 (1st Cir. 2002).

## III. **Analysis**

We begin with the issue of statutory interpretation. The district court limited the interpretation of the phrase "at prices which are substantially different" contained in § 264 of the Puerto Rico statute to only those situations where a supplier offers its product at a substantially lower price to Puerto Rican customers as opposed to non-Puerto Rican customers, and ruled out those situations where a supplier charged the Puerto Rican company substantially more than a non-Puerto Rican company.

Neither this circuit nor the Puerto Rican commonwealth courts have determined the pricing behaviors covered by § 264. DJM contends that the statute prohibits charging either less or more for goods in Puerto Rico. Thus, DJM argues that the district court

-5-

erred when it viewed the statute as an anti-dumping statute that prohibits only the charging of lower prices in Puerto Rico. Finally, DJM argues that § 264 is clear on its face and that we should thus refrain from examining its legislative history. We disagree -- as will be explained, we find the statute ambiguous and turn to other sources for aid in construction.

### A. Ambiguity

Section 264 states:

> It shall be unlawful to sell, contract to sell, offer to sell, or participate in any step for the sale of articles in Puerto Rico, after making due allowance for differences in costs incident to the delivering of goods in Puerto Rico and the costs of handling such goods in Puerto Rico, at prices which are substantially different from prices charged or quoted by such sellers for goods of the same grade or quality to buyers located outside of Puerto Rico, when such difference in price is granted with the purpose of destroying competition or eliminating a competitor located in Puerto Rico.

10 P.R. Laws Ann. § 264. Although DJM would have us consider only the whether the phrase "prices which are substantially different" ("different price language") could, on its face, apply to the charging of higher and lower prices, we must consider the phrase in the context of the entire statutory provision in order to determine if the statute covers situations such as the one alleged here. See, e.g., Allied Chem. and Alkali Workers of Am. Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 185 (1971) (indicating that courts "must not be guided by a single sentence or member of

-6-

a sentence, but look to the provisions of the whole law") (internal quotations and citations omitted).

We begin by noting that the different price language does not appear ambiguous when considered in isolation. Unlike the Federal Anti-Dumping Act of 1916, which the district court viewed as a model for this statute, there is no specific prohibition against charging "a price substantially less" in Puerto Rico -- instead the legislature chose the broader term "substantially different," which could cover both higher and lower pricing.[3] Although it may appear quite obvious that the word "different" could encompass both higher and lower prices, this does not mean

---

[3] The Federal Anti-Dumping Act reads in pertinent part:

> It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold such articles within the United States at <u>a price substantially less</u> than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production, or of other foreign countries to which they are commonly exported after adding to such market value or wholesale price, freight, duty, and other charges and expenses necessarily incident to the importation and sale thereof in the United States: Provided, That such act or acts be done with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States.

15 U.S.C. § 72 (2003) (emphasis added). Clearly, the Puerto Rican legislature did not merely adopt the provision wholesale, but rather changed significant portions of it.

that the statute is unambiguous and that it clearly encompasses DJM's claim.

When we consider whether the statute as a whole encompasses DJM's claim, its ambiguity emerges. In particular, here we have a situation where the alleged price discrimination is having a potential detrimental effect not on the seller's competition (horizontal competition or competitors), but rather on the buyer's competition (vertical competition or competitors). On its face, the statute does not clearly encompass claims involving harm to vertical competitors caused by the charging of higher prices in Puerto Rico.

The Robinson-Patman Act, on which this statutory provision was loosely modeled,[4] has been applied to secondary line competition and does explicitly cover effects on non-sellers. <u>See</u> 15 U.S.C. § 13 (2003) (stating "[i]t shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them").

---

[4]  <u>See</u> Arturo Estrella, <u>Antitrust Law in Puerto Rico</u>, 28 Revista del Colegio de Abogados de Puerto Rico, 505, 624-25 (1968).

State statutes that cover behavior affecting secondary line competition do not typically have explicit terms to that effect -- quite the contrary, where secondary line competition is <u>not</u> covered, the statutes are explicit. <u>See</u>, <u>e.g.</u>, Cal. Bus. & Prof. Code § 17040 (2003) (prohibiting price discrimination in a given locality by "any person engaged in the production, manufacture, distribution or sale of any article or product of general use or consumption, with intent to destroy the competition of any regular established dealer in such article or product"); <u>see also</u> Erwin S. Barbre, Annotation, <u>Validity and Construction of State Statutes Forbidding Area Price Discrimination</u>, 67 A.L.R.3d 26 (2001) (citing only three cases involving a finding that state statutes did not apply to secondary line competition). Absent an explicit term to the contrary, § 264 could apply to secondary line competition, thus encompassing DJM's claim. It is precisely because the statute <u>could</u> but does not explicitly encompass DJM's claim that consultation of other sources would be not only prudent, but necessary. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>O'Neil</u>, 11 F.3d 292, 297-98 (1st Cir. 1993) (noting that "ambiguity is commonly thought to exist when statutory language is susceptible to differing, but nonetheless plausible, constructions").

## B. Legislative History

As will presently be seen, the legislative history[5] clarifies that the different price language was meant to apply only to the charging of lower prices. Although on its face the different price language may appear to include the charging of higher or lower prices, "[e]ven the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent." National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers, 414 U.S. 453, 458 (1974). Indeed, the First Circuit has "overridden literal language where it appeared inadvertent and undermined [the legislature's] aim." United States v. Estrella, 104 F.3d 3, 8 (1st Cir. 1997).

The legislative history supports a narrow reading of § 264 as an anti-dumping statute. Most persuasively, a section in the Senate committee report indicates that "[t]he purpose of this section is not to prevent merchandise from entering Puerto Rico at prices that are lower than those prevalent in other markets. The prohibition is limited to classic dumping." Diario de Sesiones, Vol. XVIII, at 1708.

---

[5] We assume that the official translations included in the record contain all relevant portions of the legislative history. See, e.g., Estades Negroni v. Assocs. Corp. of N. Am., 2003 U.S. App. LEXIS 20066, *11 (1st Cir. 2003) (reiterating that "'this Court may not consider non-English documents unless a translation is provided'") (quoting Ramos-Báez v. Bossolo-López, 240 F.3d 92, 94 (1st Cir. 2001)).

Similarly, an article written by Arturo Estrella, the then Deputy Secretary of Justice, a few years after the enactment of § 264 indicates that the law's "main purpose - though not the exact wording - coincides with that of the United States Anti-Dumping Act of 1916, prohibiting importation into the United States of articles for sale at prices that are less than their market value outside the United States . . ." Arturo Estrella, <u>Antitrust Law in Puerto Rico</u>, 28 Revista del Colegio de Abogados de Puerto Rico 505, 624-25 (1968). According to DJM, the fact that this is the <u>main purpose</u> of the statute allows for the interpretation that § 264 also applies to the charging of higher prices in Puerto Rico. If one reads the entire excerpt, however, it is clear that this reading is not possible because Estrella states, "The phrase 'substantially different' was used with the intention of outlawing 'lower prices.'" <u>Id.</u> (quoting Diario de Sesiones, Vol. XVIII, at 1708).

Although there are only limited portions of legislative history in the record,[6] those excerpts indicate that the statute was meant to apply only to <u>lower</u> prices. We interpret the statute

---

[6] Only Tex-Shield has provided excerpts of legislative history for this Court's consideration. In its response brief, DJM merely analyzes the excerpts provided by its opponents and does not bring to the Court's attention any other relevant portions of the legislative history. Previously, DJM relied on a plain language argument rather than resorting to legislative history, which certainly suggests that there is little or no history to support DJMs interpretation.

narrowly and hold that it does not embrace the charging of higher prices by a supplier to a Puerto Rican company.  Dumping behavior is not alleged here, thus DJM has failed to state a valid claim under the statute and the district court properly dismissed the complaint.[7]

### III.  Conclusion

For the foregoing reasons, the district court's dismissal of the complaint is affirmed.

**Affirmed**.

---

[7]   With regard to the issue of whether the statute applies to vertical competition, none of the excerpted portions of the legislative history brought to the Court's attention address the issue.  We need not decide if the statute covers both vertical and horizontal competition, however, because we find that only cases involving the charging of lower prices in Puerto Rico can be brought under the provision.